William **MARTIN, Joe Velez, Jose Gonzalez, Russell Carpino,** and **George Johnson,** individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

**AMR SERVICES CORPORATION,** a subsidiary of AMR Corporation, Defendants.

No. 93–CV–4900 (JBW).

United States District Court, E.D. New York.

Feb. 22, 1995.

110

Stuart A. Weinberger, Law Offices of Richard M. Greenspan, P.C., Ardsley, NY, for plaintiffs.

Edward A. Brill, Proskauer, Rose, Goetz & Mendelsohn, New York City, for defendants.

### MEMORANDUM, ORDER AND JUDGMENT

WEINSTEIN, Senior District Judge:

Plaintiffs charge that defendant AMR Services Corp. ("AMR") failed to comply with the notice requirements of the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. § 2101 *et seq.*, when it closed its Security Department at New York's John F. Kennedy Airport in the Spring of 1993. All relevant evidence has been produced by discovery or adequate affidavits and concessions in argument or in briefs.

AMR moves for summary judgment, contending that since fewer than 50 employees suffered an "employment loss" as defined by WARN, that statute's notice requirement were not triggered and therefore no statutory violation occurred. Plaintiffs also seek summary judgment. At issue is whether AMR's actions with respect to 18 employees placed in other jobs at AMR shortly after they were told their department had been eliminated suffered an employment loss as defined by WARN. Since these employees did not lose their employment, AMR's motion for summary judgment is granted and plaintiffs' cross motion is denied.

### I. FACTS

AMR is an aviation ground services company whose operations include freight distribution and servicing, baggage handling, aircraft parts distribution, and other services for the airline industry. In May 1993, AMR decided to close its Security Department at JFK Airport and contract-out its functions. At the time, AMR employed 91 people in the security unit, one salaried manager and 90 hourly workers.

The parties agree that AMR is an employer as defined under WARN, 29 U.S.C. § 2101(a), and is subject to its provisions. In addition to the rights that employees may have under WARN, AMR employees have additional rights under AMR's internal employment regulations, specifically AMR's "Reduction in Force/Recall" manual ("RIF Regulations").

Under the RIF Regulations, "[e]mployees may be declared surplus as a result for [sic] a need for reduction in force in a specific work unit." A subsection of the RIF Regulations entitled "Reduction in Force Policy" provides seniority-qualified worker protections common in industry. It states:

All surplused employees in the specific work unit affected will have the following placement options . . .:

   a.  The senior most qualified employees (i.e. individual ability to adapt to new position, prior job performance/attendance, performance evaluation, etc.) may displace a probationary employee in the same job classification in a similar work unit at the station.

   b.  The senior most qualified employee may fill existing vacancies in the same or other job classifications in the system.

General Manager or Regional Personnel Manager for the station affected by a reduction in force will contact Director Personnel, HDQ, to obtain complete list of vacancies in the system.

Qualified employees will be interviewed for position(s). It is management's discretion to offer or not offer the position.

Employee's pay would be rated on the last day worked in position from which surplused, or minimum rate of the new position, whichever is greater. If rate at time of surplus is greater than new rate, market rates will govern.

If either option a or b is not available to surplused employees he/she will be subsequently laid-off from the company.

RIF Regulations at 1–2.

Another subsection, entitled "Recall," provides for employment of laid off workers. It reads:

Surplused employees who have completed probation prior to, or on the last day worked, will be placed on the recall roster. . . .

An employee retains recall rights to position(s) from which surplused for two years from the last day worked in that position. . . .

Recalled employees will be paid their former rate held when surplused, or the minimum for the position to which recalled, whichever is greater. . . .

Employees will not accrue seniority while on layoff. Upon recall or reemployment during active recall period, seniority accrued before layoff will be credited to the employee.

*Id.* at 3.

AMR sent letters dated May 21, 1993 to each of the 90 hourly workers stating that they had been "declared surplus" due to the Security Department's elimination. The letters provided that the employees' final day of work would be May 31, 1993, but that they would be paid through Friday, June 4, 1993. A similar letter dated May 3, 1993 advised the department manager that his last day was May 3, 1993 and that he would be paid through May 17, 1993. The letters noted that those employees who were members of the AMR Services Corp. Group Life and Health Benefits Plan "may elect to convert [their] coverage to an individual policy," and that "[s]olicitation for conversion [would] be sent under separate cover." Solicitations for conversion were subsequently provided to the 11 employees who were eligible members of the health plan. There is some disagreement between the parties regarding the status and disposition of a number of the employees. AMR contends that the 90 hourly employees should be classified as follows:

1) 19 part-time employees who worked an average of fewer than 20 hours per week in the 90 days preceding the date on which notice under WARN would have been due.

2) 7 part-time employees who worked fewer than 6 of the 12 months preceding the date on which WARN notice would have been due.

3) 18 employees who were immediately placed in other AMR jobs at JFK airport, pursuant to AMR's RIF Regulations, with no loss of time on the job.

4) 5 employees who were laid off effective June 4, 1993, but were then recalled to other AMR jobs at JFK Airport within 6 months.

5) 13 employees who transferred to jobs at other AMR Corp. subsidiary companies, American Airlines, or Flagship Airlines.

6) 28 employees who were laid off for longer than 6 months.

Plaintiffs do not dispute AMR's description of the part-time employees, groups (1) and (2) above. They do, however, dispute the

contention that the employees in group (3) were notified pursuant to AMR's RIF Regulations. They also argue that the employees in group (3) and (4) were not "laid off" or "immediately placed" in other positions, contending instead that these employees were "terminated."

According to an uncontradicted affidavit submitted by AMR's Personnel Supervisor, Mildred L. Hammack, it is AMR's practice to generate transaction records "in the normal course of business to reflect any employee's termination from the company," and other changes in an employee's status, including lateral transfers, reassignments to other jobs due to reorganizations, or promotion. Hammack Aff. at 8. AMR generated one transaction record for each of the 18 employees in group (3) to reflect their changes in employment. The records reveal that the 18 employees were placed in their new positions on either May 29, June 4, June 5, or June 7, 1993. Hammack Aff. at 7 and copies of original records. Codes in the transaction records for these employees further identify their changes in status, as denoted by AMR, as either "lateral," "reassignment," or "promotion," with one record noting "correction." Hammack Aff. at 7. According to Ms. Hammack's affidavit,

> None [of the 18 employees] received the termination information that is sent in the normal course of business to AMR employees whose employment is being terminated; none ever received the payment for accrued vacation time that is normally due an employee upon termination; and all retained their existing company seniority, as reflected on the transaction records evidencing their job placements.

Hammack Aff. at 8.

The parties have agreed to narrow the scope of their dispute to the 18 employees in group (3). The resolution of their status is dispositive of the motion.

## II. LAW

### A. WARN Provisions

WARN requires 60–day notice of plant closings or other specified types of employee terminations. It provides:

> An employer shall not order a plant closing or mass layoff until the end of a 60–day period after the employer serves written notice of such an order—
>
> > (1) to each representative of the affected employees as of the time of the notice or, if there is no such representative at that time, to each affected employee
>
> > . . . .

29 U.S.C. § 2102(a). The parties agree that AMR is an "employer" as defined by WARN. See id. § 2101(a)(1).

The term, "mass layoff," is defined in terms of numbers and percentages of those laid off as a "reduction in force" which:

> (A) is not the result of a plant closing; and
>
> (B) results in an employment loss at the single site of employment during any 30–day period for—
>
> > (i)(I) at least 33 percent of the employees (excluding any part time employees); and
> >
> > (II) at least 50 employees (excluding any part-time employees); or
> >
> > (ii) at least 500 employees (excluding any part-time employees).

Id. § 2101(a)(3)(A)–(B). "Employment loss" is defined as a termination, a lay off exceeding 6 months, or a substantial reduction in hours of work:

> (A) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (B) a layoff exceeding 6 months, or (C) a reduction in hours of work of more than 50 percent during each month of any 6–month period.

Id. § 2101(a)(6). Lay offs do not constitute an "employment loss" unless they exceed six months' duration. Id.; see Kildea v. Electro Wire Prods., Inc., 775 F.Supp. 1014, 1019 (E.D.Mich.1991); Jones v. Kayser–Roth Hosiery, Inc., 748 F.Supp. 1276, 1284 (E.D.Tenn.1990).

### B. Practical, Effects–Driven Conception of "Employment Loss"

In construing "employment loss" under WARN, a court must consider whether, as a practical matter, a break in employment actually occurred. In Moore v. Warehouse

*Club, Inc.*, 992 F.2d 27, 30 (3d Cir.1993), the court explained that the issue is not "timing of the transfer offer" but "whether the employees experienced an employment loss." It held that no employment loss occurred where transfer offers were extended on the date of closing rather than prior to it. *Cf. Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1279–80 (10th Cir.1994) (reviewing, without comment, district court's reasoning that where the termination was only " 'technical,' " in that employees were rehired just a " 'millisecond' " after termination, no employment loss occurred).

Where a worker has ceased reporting to work but continues to be paid, at least one court has held that the employment loss begins when the payment ends. *See United Mine Workers, Dist. 2 v. Helen Mining Co.*, No. 93–1131, 1994 WL 287611, at *8 (W.D.Pa. Apr. 18, 1994) (implies that employees who were laid off January 14, 1993 but who continued to receive pay through April 12, 1994 (day of mine's closing) did not suffer employment loss prior to the later date). These precedents support a practical, effects-driven analysis of whether a break in employment actually occurred.

■ The time frame specified in WARN'S definition of the term "mass lay off" under the statute also supports this reading. A "mass lay off"—which may involve both terminated and laid off workers—is defined as a "reduction in force which ... results in an employment loss at the single site of employment during any 30–day period" of the specified number of employees. 29 U.S.C. § 2101(a)(3). Employees who are laid off and then subsequently rehired within the relevant 30–day period cannot be counted for "employment loss" under WARN. *See Kildea v. Electro Wire Prods., Inc.*, 775 F.Supp. 1014, 1019 (E.D.Mich.1991); *Office & Professional Employees Int'l Union v. Sea–Land Serv., Inc.*, No. 90 CIV 2559, 1991 WL 136036, at *5 (S.D.N.Y. July 18, 1991) ("[A] layoff and recall which occurred within a 30 day period cannot be an employment loss.").

■ Finally, the legislative purpose underlying the statute—to "ensure adequate opportunities (by way of notice of imminent employment loss) for retraining and/or reemployment," *Moore*, 992 F.2d at 30,—requires a practical view of the actual employment situation of workers. WARN is designed to give "workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market." 20 C.F.R. § 639.1 (1994); *see also* 134 Cong. Rec. S8374 (daily ed. June 22, 1988) (statement of Sen. Byrd) (purpose is to enable workers to "save some money for the lean days ahead ... [and to] give[ ] local government time to prepare for new burdens on its retraining and education programs"); 134 Cong.Rec. S7672 (daily ed. June 13, 1988) (statement of Sen. Roth) (purpose is to "cushion the financial and psychological blow of job loss ... [and to] help ... individuals to make the transition to another form of productive, rewarding employment"); *cf. Headrick*, 24 F.3d at 1279–80 (noting district court's conclusion that "Congress meant 'employment loss' to cover only employees truly idled or deprived of income"). Where employees are transferred almost instantly to other positions, the need to ensure adequate time for retraining or reemployment does not exist.

At first blush, the above analysis might seem to conflict with case law construing "termination" in the context of applying whatever statute of limitation governs a WARN violation. The Second Circuit Court of Appeals has noted in passing that "a termination *immediately* qualifies as an employment loss," in contrast to a lay off, which must exceed six months in duration. *United Paperworkers Int'l Union & its Local 340 v. Specialty Paperboard, Inc.*, 999 F.2d 51, 52 (2d Cir.1993) (emphasis added) (citing 29 U.S.C. § 2101(a)(6)(A)); *see also Automobile Mechanics' Local No. 71 v. Santa Fe Terminal Servs., Inc.*, 830 F.Supp. 432, 434 (N.D.Ill.1993) ("[A] termination results in an *immediate* employment loss.") (emphasis added). Arguably, if a termination does qualify instantly as an employment loss, the fact that employees are subsequently rehired or placed in other positions is irrelevant to the WARN calculation. The holdings of

*United Paperworkers Int'l Union* and *Automobile Mechanics' Local No. 71,* however, are confined to the statute of limitations context. The courts were there concerned with the separable issue of fixing a date on which to start the statute of limitations running. The approach appropriate for determining the fixed dates required under statute of limitations analysis is not useful where the court must determine whether an "employment loss" occurred.

### C. Lay Off vs. Termination

Plaintiffs urge that they were "terminated," rather than laid off, and that the employment loss occurred immediately and could not be remedied by subsequent rehire. As noted above, such a rigid construction of "employment loss" is not supported by the statute and its history. Yet, they contend that the distinction between lay offs and terminations lies, at least in part, in an employee's subjective belief that he or she has been terminated, and his or her lack of a "reasonable basis for believing that [he or she] would be reemployed." Memorandum in Support of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment 10.

■ The proposed subjective standard is based upon that sometimes utilized in determining whether the subsequent termination of a previously laid off employee constitutes an "employment loss" for WARN purposes. Under federal regulations a "reasonable expectation" of recall by the worker is relevant in determining whether he or she remains an employee for WARN purposes:

> "Workers on temporary layoff or on leave who have a reasonable expectation of recall are counted as employees. An employee has a 'reasonable expectation of recall' when he/she understands, through notification or through industry practice, that his/her employment with the employer has been temporarily interrupted and that he/she will be recalled to the same or to a similar job."

20 C.F.R. § 639.3(a)(1) (1994); *see also Jones v. Kayser–Roth Hosiery, Inc.,* 748 F.Supp. 1276, 1284 (E.D.Tenn.1990); *Damron v. Rob Fork Mining Corp.,* 739 F.Supp. 341, 343

(E.D.Ky.1990), *aff'd,* 945 F.2d 121 (6th Cir. 1991). It is not necessary to now decide whether the phrase "reasonable expectation" in the regulation requires an "objective" or "subjective" test. The provision appears designed to prevent employers from circumventing WARN requirements in bad faith by "laying off" employees before "terminating" them. The facts of the instant case suggest no hint of such bad faith. *Cf. Office & Professional Employees Int'l Union v. Sea–Land Serv., Inc.,* No. 90 CIV 2559, 1991 WL 136086, at \*5 (S.D.N.Y. July 18, 1991) (court's consideration of whether temporary recall of laid off workers "was an attempt to evade WARN's requirements").

■ In distinguishing between lay offs and terminations for purposes of calculating employment loss under WARN in situations such as AMR and its employees faced, what is required is not a finding respecting each employee's subjective belief regarding his or her future with the company, but an objective evaluation of 1) whether any existing lay off or reduction in force regulation was properly invoked; and 2) whether the lay off and transfer provisions of the regulations as applied offered a reasonable likelihood that employment would continue.

## III. APPLICATION OF LAW TO FACTS

The parties agree that 26 of the employees were part-time as defined under WARN, 29 U.S.C. § 2101(a)(8) (definition of part-time workers), and thus should not be counted in determining total employment loss. *Id.* § 2101(a)(3)(B) (excludes part-time employees from WARN calculation). Thus if the 18 who were transferred to other AMR jobs did not experience an "employment loss" within the meaning of the statute because their employment was not "terminated," then the 50–employee minimum requirement of WARN would not apply ($91 - 26 - 18 = 47$).

Employment of the 18 employees was essentially continuous. No disruption sufficient to constitute an "employee loss" occurred. At most these employees were at risk of being laid off, not terminated. Under WARN, a lay off must extend to six months

before it can be counted an "employment loss." Since they were immediately transferred there was almost no period that could be construed as a lay off.

### A. Employment was Continuous

As a practical matter, no break in employment of the 18 workers occurred. While specifying a final working day of May 31, AMR was committed to paying these employees through June 4, 1993. They were placed in their new positions on either May 29, June 4, June 5, or June 7, 1993. None of the 18 workers experienced a gap in pay since only a weekend separated the date through which compensation was promised, June 4, and the latest date on which work in a new position commenced, June 7. Even if the relevant "termination date" is considered May 31 rather than June 4, the most that can be said is that the employees were laid off for a week or less, far less than the thirty-day and six-month periods provided under WARN.

### B. Employees Were at Most at Risk of Being Laid Off

Plaintiffs contend that "[t]he plain language and purpose of WARN dictates that AMR cannot cure what is otherwise a termination of employment by subsequently offering the terminated employees new positions with the company." Memorandum in Support of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment 11–12. Such a rigid construction of the statute is inconsistent with the statute's language and purpose. *See* Part II.B *supra.* The facts, moreover, establish that plaintiffs were never terminated; at most they were at risk of being laid off.

In asserting that the 18 employees were terminated rather than laid off, plaintiffs emphasize the following facts that they assert represent indicia of termination: 1) the letter of May 21, 1993 did not mention the RIF Regulations or include a copy of them; 2) under the RIF Regulations, employees do not have an absolute right to other positions in the defendant's organization, but such placements are subject to the management's discretion; 3) the employees allegedly sub-jectively believed that they had been terminated with no reasonable expectation of the possibility of transfer to or reemployment at another AMR position; and 4) the May 21, 1993 correspondence apprised the employees of their right to continue medical coverage on an individual basis under the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. 1161 *et seq.*

While the indicia of termination noted by the plaintiffs are arguably relevant to an analysis of whether a lay off is bona fide, they are not dispositive. Since COBRA requirements may be triggered both by lay offs and terminations, *Local 217, Hotel & Restaurant Employees Union v. MHM, Inc.*, 976 F.2d 805, 809 (2d Cir.1992), inclusion in the letter sent to employees of the reference to rights under COBRA is not a reliable basis for distinguishing between the two possibilities. While an employee's subjective beliefs regarding the likelihood of future employment may be relevant in some WARN contexts, it is not the standard that should be used in evaluating whether an "employment loss" has occurred in situations such as these 18 employees faced. *See* Part II.C *supra.* Neither are the other "indicia" cited by the plaintiffs persuasive, in light of the undisputed facts and sense of the good faith continuing employment situation in this case.

The main legal authority that plaintiffs cite for their argument that the 18 employees were terminated is *CBS, Inc. v. International Photographers of Motion Picture Indus., Local 644*, 603 F.2d 1061 (2d Cir.1979) (per curiam). The facts of *CBS* support the opposite conclusion. There, an employer sought to circumvent arbitration provisions in the employees' collective bargaining agreement by claiming that employees had been placed on permanent lay off rather than discharged. In rejecting the employer's characterization, the court explained that in contrast to discharge, "[a] layoff . . . is ordinarily a 'period of temporary dismissal;' inherent in the term is the anticipation of recall." 603 F.2d at 1063. The court, in finding a discharge, relied upon the employer's failure to use the word "lay off," its failure to allude to the possibility of recall in its discharge letters, and its hiring of freelance cameramen to

replace permanently the terminated employees.

In the instant case the RIF Regulations explicitly assert that surplused employees who are not placed in other positions are "*laid-off* from the company" and "retain[ ] *recall rights* to position(s) from which surplused for two years from the last day worked in that position." *See* RIF Regulations at 2, 3 (emphasis added). Furthermore, as a practical matter, whether the 18 employees were laid off and subsequently recalled, or simply transferred, they were not replaced.

Where there is a preexisting policy that mandates a "lay off" with clear criteria for recall, the concern that an employer will manipulate employment terminology to circumvent federal requirements is minimized. In the instant case, the existing lay off or reduction in force regulations were properly invoked. As demonstrated by the facts of continuing employment of the 18 by AMR, the lay off and transfer provisions of the RIF Regulations are bona fide; they offer a reasonable likelihood that employment will continue in some fashion.

Application of the preexisting RIF Regulations, under which "[e]mployees may be declared surplus as a result for [sic] a need for reduction in force in a specific work unit" was appropriate in the instant case. *See* RIF Regulations at 1. The closure of the Security Department did in fact necessitate a "reduction in force" in that department.

█ Plaintiff's implication that the RIF Regulations were improperly invoked in an effort to circumvent WARN requirements is unsupported. Lay offs under the RIF Regulations are more than terminations in disguise. The Regulations offer a substantive promise of an employer's good faith effort to transfer or recall employees who are "surplused." There is every indication that AMR sought to continue these employees' association with the company, to the extent that it could, following the retrenchment. According to AMR records and the uncontradicted Hammack affidavit, the 18 employees did not suffer a loss in seniority; none received the payment for accrued vacation time that is normally sent to employees upon termi-

nation; and none received the termination information that is sent in the normal course of business to AMR employees whose employment is being terminated. Plaintiffs have neither challenged these aspects of the Hammack affidavit nor offered alternative evidence. Application of the RIF Regulations reflected a bona fide attempt to retain "surplused" workers rather than an attempt to circumvent WARN provisions or other employment regulations. Regardless of whether AMR's actions with respect to the 18 employees constituted a transfer or a temporary lay off with immediate recall, plaintiffs were realistically never in danger of "termination."

Perhaps it could be argued in other contexts that, where the employee's "position" has been eliminated, the "right of recall" promised under the RIF Regulations is meaningless, and that therefore a termination has taken place. The recall policy of AMR, however, suggests that recall rights are based on "job title." RIF Regulations at 3 (stating that recall rosters are to be kept by "job title" and are to note "each employee's skills (language, computer training)"). Thus, even after the Security Department closing, other job positions with the same "job title" as those eliminated might have existed elsewhere at AMR and its subsidiaries. At least one "surplused employee" was offered the opportunity to exercise his recall rights, although that opportunity was later withdrawn. Winfield Aff.; Plaintiffs' Cross–Motion for Summary Judgment exh. A (letter from AMR, dated 3/7/94, offering "immediate reemployment in your former classification"). This employee's experience, along with the immediate transfer of the 18 employees subject to the dispute, demonstrates that the RIF Regulations offered more than an empty promise to those employees whose jobs were eliminated upon the Security Department's closing.

█ In view of AMR's policies regarding "surplused" employees, evidence proffered about the policies' practical applicability and AMR's adherence to them, and AMR's treatment of employees' seniority and vacation pay pursuant to its normal business

practices, no "termination" occurred with respect to the 18 employees. At worst, they were at risk of being laid off. Since the letters received by the employees provided for May 31, 1993 to be the last date of continuing employment in the prior position, and the 18 employees were placed in their new positions effective May 29, June 4, June 5, or June 7, 1993 at the latest, any "lay off" experienced was substantially less than the six months required under the statute. Under the circumstances, an "employment loss" sufficient to trigger WARN's notice requirements was not, and cannot, be shown.

## IV. SUMMARY JUDGMENT

Summary judgment is appropriate since uncontroverted documents "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The critical facts are not in dispute. They support the defendant's position. See R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir.1984) ("concrete particulars" must be provided showing a need for trial, quoting SEC v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir.1978)); cf. Office & Professional Employees Int'l Union v. Sea–Land Serv., Inc., No. 90 CIV 2559, 1991 WL 136036, at *5 (S.D.N.Y. July 18, 1991) ("[The plaintiff's] unsupported allegations of evasion [of WARN's requirements through strategic temporary recall of laid off workers] cannot withstand a motion for summary judgment.").

## V. CONCLUSION

No genuine issue of material fact exists with respect to whether an employment loss sufficient to trigger WARN's notice requirements occurred. Of the 91 employees employed in the department that was eliminated, 26 were part-time and therefore are excluded from WARN's calculations. The 18 employees whose jobs were eliminated but who were transferred almost instantaneously to other positions at AMR did not experience an employment loss as defined under WARN. The remaining employees whose change in employment status might be cognizable under WARN number fewer than 50. As a matter of law, since any employment loss was short of the threshold amount required to trigger WARN's notice provisions, no statutory violation occurred.

Defendant's motion for summary judgment is granted. Plaintiff's cross motion is denied. The case is dismissed. No costs or disbursements are granted.

SO ORDERED.