Angel **MARTINEZ**, on behalf of himself and as class representative of all other persons similarly situated, Plaintiff,

v.

**CARAVAN TRANSPORTATION, INC.,** Caravan Transit, Inc., and Transport Workers Union, Local 100, Defendants.

No. 01 CV 0540(NG).

United States District Court, E.D. New York.

March 21, 2003.

Ralph A. Somma, for plaintiff.

Susan M. Jennik, New York City, counsel for defendant Local 100.

Jeffery D. Pallack, counsel for defendants Caravan, Transportation, Inc., and Caravan Transit, Inc.; for defendant.

### ORDER

GERSHON, District Judge.

Plaintiff, Angel Martinez, initiated this action on behalf of himself and a class of similarly situated persons, alleging that Caravan Transportation, Inc. ("Transportation") and Caravan Transit, Inc. ("Transit" and, together with Transportation, the "Corporate Defendants") violated the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1061, *et seq.*, the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. §§ 2101, *et seq.*, the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 and the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961. Martinez also alleges that Transport Workers Union, Local 100 ("Local 100" and, together with the Corporate Defendants the "Defendants"), violated the LMRA and RICO. By stipulation dated April 12, 2001, Martinez withdrew his RICO claims and has now withdrawn his ERISA claims except for a request for attorney's fees.

The Defendants now move pursuant to Fed.R.Civ.P. 56, for an Order granting summary judgment against Martinez's LMRA claim on the grounds that this claim is barred by lack of subject matter jurisdiction, the statute of limitations, preemption under *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), and failure to exhaust the contractual grievance procedure. The Corporate Defendants also seek summary judgment dismissing Martinez's WARN claim on the ground that the Mollen Agreement, between the New York City Board of Education (the "Board") and the Corporate Defendants, renders the WARN claim inapplicable. Separately, Transit seeks summary judgment against all of Martinez's claims on the ground that Transit is not properly a defendant in this action. Local 100 seeks summary judgment against Martinez's fair representation claim on the ground that Martinez cannot show that Local 100 breached its duty of fair representation.

### The Facts

Unless otherwise indicated, the following facts are undisputed.

Local 100 is a labor organization representing transportation workers, including Martinez and the purported class. Martinez became a member of Local 100 when he started working for Transportation in 1992. Under Larry Greene's ownership, Transportation held contracts with the

Board, to transport regular education students, and Transit held the contracts for transporting special education students. As the result of a strike settlement in 1979, every transportation contract awarded by the Board, including those awarded to the Corporate Defendants, contains a provision known within the New York City School Bus transportation industry as the Mollen Agreement. The Mollen Agreement provides, *inter alia*, for the establishment of an industry wide master seniority list for bus drivers. The Mollen Agreement states, in relevant part, that "any contractor...shall give priority in employment...on the basis of position on the master seniority list." [1] Contractors are bound by this provision "to hire new personnel from a seniority list consisting of drivers from other bus companies who had become unemployed due to the reassignment of routes..." [2] Simply put, an employee is ranked according to his industry wide seniority, and in the event that an employer needs to hire a new driver, the employer must hire the highest ranked (most senior) driver then available.

Prior to June 14, 2000, Greene was the sole owner, manager and labor negotiator for Transportation and Transit. While both Transportation and Transit each held contracts with the Board, Transit did not have any employees or own any buses. Drivers employed by Transportation, including Martinez, performed all the work under the Transit and Transportation contracts. The driver's wages were paid by Transportation, not Transit.

George Jennings was the Director of the Private Lines Division of Local 100 from 1994 until January 2001. In this capacity Jennings represented the employees of Transportation and negotiated the 1996–2000 collective bargaining agreement (the "CBA") between Local 100 and Transportation. Transit was not a signatory to the CBA. In September of 1999, Greene, the then owner of the Corporate Defendants, entered into negotiations with Jennings and other members of Local 100 in the hopes of securing some concessions from Local 100's membership. At this time Greene told Jennings that, unless concessions were agreed to, he would not be able to continue his business beyond the expiration of the CBA. Shortly after the initial meetings with the union leadership, Greene attended a meeting with the union membership where he reiterated his concerns. Additional negotiating sessions were then held, the results of which were given to the union members. During these meetings, Jennings again told the drivers of the possibility that Greene would close his business if the membership did not accept the concessions. Ultimately, the union leadership and Greene agreed to certain terms, including concessions, which were memorialized in a memorandum of agreement and brought before the union membership for approval. Jennings acknowledges that he was not enthusiastic about the new terms, but he believed that it was the best that the union could negotiate at the time. Jennings and other members of the union leadership discussed the proposed concessions with Local 100's membership, but did not recommend approval or rejection of the agreement. On January 20, 2000, the union membership voted to reject the proposals. Martinez, despite his claims that Jennings did not do a good job negotiating, voted in favor of the agreement. Shortly thereafter, Greene again told Jennings that he was

1. *See* Joint Defense Exhibit Tab A.

2. *Lynzee Transportation Co. Inc., et al. v. Board Of Education of the City of New York,* 102 Misc.2d 497, 423 N.Y.S.2d 572, 573 (N.Y.Sup.1979).

going out of business. (Martinez, despite admitting that Greene told Jennings that he was going to close his business, denies that Jennings knew that Greene was going out of business. Martinez states that he (and Jennings) thought that Greene was merely using the threat of a shop closure as negotiating leverage.)

In March of 2000, Jennings first learned that Jeffery DeStefano, a Transportation executive, wanted to purchase the special education contacts held by Transit. Destefano also sought to reopen negotiations with Local 100; Jennings, however, refused to negotiate until DeStefano had actually made the purchase. On March 23, 2000, DeStefano sent a letter to the union membership discussing Local 100's refusal to negotiate and the possibility that the refusal could result in all of the Transportation employees losing their jobs. Jennings opposed DeStefano's attempts to negotiate directly with the union membership and advised the membership that acceptance of DeStefano's proposals would not be in their best interest. Despite being unable to secure concessions from Local 100, DeStefano purchased Transit together with the contracts to operate the special education runs from Greene. The sale was approved by the Board in June of 2000. The documents used to effectuate the purchase all contemplate the sale of Transit's stock in combination with the assignment of the special education runs and certain assets to Transit as organized under DeStefano after June 14, 2000 (the new company purchased by DeStefano will be referred to as "New Transit").

Upon the sale of Transit's stock and the assignment of the special education runs to DeStefano, the least senior Local 100 members employed by Greene were laid off and then rehired by DeStefano. Transportation's remaining employees, including Martinez (the "Remaining Employees"), then chose among the regular education routes in accordance with their seniority.

Upon notice of closing to Local 100, Greene closed Transportation on June 30, 2000. For the following school year, Greene wanted to sell his remaining routes to a company operated by Joseph Fazzia under the name of Jofaz. Local 100 opposed this transaction because it believed that Jofaz employees were represented by a union with a substandard collective bargaining agreement. Local 100 demanded assurances that Greene's remaining employees would go to companies that were represented by Amalgamated Transit Union, Local 1181 ("Local 1181"), because Local 100 believed that Local 1181 had the best contract terms in the industry. Ultimately, Local 100 prevailed on this demand, and when the Board of Education approved the sale to Jofaz, all of the Remaining Employees went to companies operating under Local 1181 contracts. (By ensuring that Greene's employees would go to companies with Local 1181 contracts, Local 100 guaranteed that these employees would retain the same rate of pay and benefits. Local 100 also convinced Local 1181 to waive its waiting period for health benefits.) In September of 2000, the Remaining Employees were instructed to report to Local 1181 to pick the company where they would work. In September 2000, Martinez went to work for a company called Focus. At Focus, Martinez's hourly pay rate was higher than what he was earning while working for Greene. Additionally, Martinez earned significantly more overtime pay while working for Focus. Local 100 received no written complaints or grievances, in accordance with the collective bargaining agreement procedure, regarding the initial employee transfer of June 14, 2000, or the employee job selection of September 2000. Martinez filed this complaint on January 30, 2001.

## Discussion

Motions for summary judgment are granted if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.[3] The moving party must demonstrate the absence of any material factual issue genuinely in dispute.[4] A material fact is one whose resolution would "affect the outcome of the suit under governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[5] The court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion.[6] However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."[7] Nor may the non-moving party "simply show that there is some metaphysical doubt as to the material facts."[8] The party must produce specific facts sufficient to establish that there is a genuine factual issue for trial.[9]

Martinez presents hybrid Section 301 claims under the LMRA, alleging that the Corporate Defendants breached the CBA and that Local 100 breached its duty of fair representation by mishandling the grievance proceedings. Although he fails to explicitly say so, Martinez's LMRA claim against the Corporate Defendants appears to be as follows: first, that the Corporate Defendants, prior to June 14, 2000, were separate entities; second, that industry practice, the CBA and/or the Mollen Agreement dictate that when a company divests itself of all its bus routes, all bus drivers "follow the work" to the new operating company; and third, that upon the sale of all the special education bus routes held by Transit to Jeffery DeStefano, Martinez was not allowed to "follow the work" and therefore lost company seniority and benefits. Martinez also claims that Local 100 improperly failed to prevent the sale of the special education routes or the subsequent transfer of junior employees to Transit.

■ To the extent that any of Martinez's claims relate to an activity that is arguably subject to Sections 7 or 8 of the National Labor Relations Act, 29 U.S.C. §§ 157, 158, those claims are preempted by the principles set forth in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959).

■ Martinez's LMRA claims are barred by the statute of limitations. The federal six month statute of limitations governs hybrid Section 301 claims.[10] The Second Circuit has applied the six month statute of limitations for hybrid claims without exception and holds that the limitation period runs from the time the employee knew or should have known of the

---

3. *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir.1995).

4. *Id.*

5. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

6. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

7. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986).

8. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

9. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

10. *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983).

alleged breach.[11]   Accordingly, the six month statute of limitations bars Martinez from making a Section 301 claim relating to the events that occurred prior to July 30, 2000 (six months prior to the January 30, 2001 filing of the complaint).

Martinez argues that he could not have known of the alleged breach by the Corporate Defendants until September of 2000, when he was told to report to Local 1181 to choose his new work assignment.   However, Martinez fails to explain how he could not have known of the alleged breach on June 14, 2000, when the original employee transfer occurred.   Martinez has not claimed that he did not receive the notices provided by the Corporate Defendants and DeStefano regarding the sale.   In addition to the notices, on June 19, 2000, Martinez participated in a job pick whereby the employees who remained at Transportation chose among the remaining routes.   In light of this, Martinez could not have been unaware of the alleged breaches until September of 2000.   Martinez's allegation that he had an expectation of returning to work at Transportation in September of 2000 does nothing to justify this lapse.   That Martinez chose his new employer in September of 2000, after Transportation itself was sold, does not change the fact that Martinez should have known of the alleged breach when forty-nine of his coworkers were transferred to New Transit.   Moreover, the heart of Martinez's claim, that he lost seniority because Transportation and Transit (with Local 100's tacit approval) violated the Mollen Agreement by wrongfully transferring certain employees, could not have been more apparent than on June 14, 2000.[12]   Mar-

tinez knew, or should have known, on June 14, 2000, that he would not be transferred with the special education routes and cannot be heard to complain that it was not until the following September that he realized that he had been wronged.

■   Even if Martinez had filed his complaint in a timely fashion it would be dismissed because he has failed to properly articulate an LMRA claim.   Martinez fails to clearly indicate how either the CBA, the Mollen Agreement or industry practice provides for his alleged "follow the work" right.   But even assuming, for the purposes of this motion, that pursuant to industry practice such a right exists under the CBA, he cannot succeed.

To find a violation, under Martinez's theory of breach, the court must determine if Transportation and Transit (as constituted prior to June 14, 2000) were one corporation constituting a single employer.   Martinez originally claimed in his complaint that the Corporate Defendants "constitute a single integrated business enterprise and a single employer."   He claimed that Transportation and Transit were successor or alter ego corporations, stating:

> "at all relevant times...Transportation and Transit, have been affiliated business enterprises with common officers, ownership, directors, managers and supervision; have formulated and administered a common labor policy affecting employees of said operations; have shared common premises and facilities; have provided services for each other; have interchanged personnel with each other; and have held themselves out to the public as a single integrated business enterprise."[13]

11.   *Carrion v. Enterprise Association*, 227 F.3d 29, 34 (2d Cir.2000).

12.   See Defense Exhibits E, F and G. In his deposition at 102–106 Martinez admits being

aware of these documents on or about their respective dates of issuance.

13.   *See* Complaint at 2;  Plaintiff's Opposition to Summary Judgment, at 11 n. 5.

However, upon the realization that, if Martinez were found to be a Transportation employee, he could not claim a loss of company seniority (as he was retained upon the sale of the special education routes), Martinez changed his claim to allege that Transportation and Transit were separate entities. Martinez concedes that, if the Corporate Defendants were in fact one entity, Martinez's LMRA claims would have to be dismissed.

■ Martinez now claims that the Corporate Defendants, prior to June 14, 2000, were two distinct entities. While, in his brief, Martinez refers to Transit as "operating the special education routes," the undisputed record supports a finding that the Corporate Defendants were operated on a wholly integrated basis and that Transit merely held the contracts for the special education routes. The factors to review when considering whether two entities constitute a single employer are (1) inter-relation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership.[14] The Court of Appeals for the Second Circuit has indicated that the use of common office facilities and equipment and family connection between enterprises are also relevant factors.[15] Each of these factors are present here.

The Corporate Defendants constituted a single employer prior to June 14, 2000. The interrelation of operations and use of common office facilities and equipment factors are met because the two companies were in the same business of transporting school children and used the same vehicles, employees and offices. Martinez's claim that he was a Transit employee is contra-dicted by the fact that all of his paychecks came from Transportation, not Transit.[16] The statements made by Greene and DeStefano regarding the sale of the special education routes indicate that the Corporate Defendants were interrelated. In the notices from the Corporate Defendants to the union membership, the Corporate Defendants state, "the run you currently perform *will no longer be operated by* Caravan Transportation Inc." In the notice from DeStefano to the union membership, he states that, after June 14, 2000, "Caravan Transit, Inc. will operate the routes *formally operated by* Caravan Transportation, Inc." The Letter of Intent, Assignment of Contract Agreement, Assumption and Assignment Agreement and the Stock Purchase Agreement all are written in contemplation of the Corporate Defendants being separated after previously operating as one entity. There was centralization of control of labor relations of the Corporate Defendants because Greene was responsible for the labor policy of both companies. Further, Transportation was the only corporate signatory to the CBA. Had Transit been a separate operating entity it would have had to enter into a CBA to hire union drivers, yet Martinez has not claimed that Transit was ever considered a separate bargaining entity by Local 100 or the union membership. Further, Martinez states, in his deposition that, he worked *for Transportation* and goes on to state in his opposition papers, that he and the other employees had an expectation of returning to work *at Transportation.* Finally, the common ownership and common management factors are met

---

**14.** *See LaBarbera v. C. Volante Corp.,* 164 F.Supp.2d 321, 325 (E.D.N.Y.2001), *citing Radio and Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc.,* 380 U.S. 255, 256, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965).

**15.** *Lihli Fashions Corp., Inc. v. NLRB,* 80 F.3d 743, 747 (2d Cir.1996).

**16.** *See* Defense Exhibit I.

because, prior to June 14, 2000, it is undisputed that Greene was the sole owner and manager of the Corporate Defendants.

As each of the relevant factors have been demonstrated beyond dispute, the court finds that, as a matter of law, the Corporate Defendants, prior to June 14, 2000, were one corporation constituting a single employer. As Martinez concedes, his LMRA claims against the Corporate Defendants are wholly dependent upon the opposite finding.

█ Martinez also fails to establish a claim against Local 100. As a preliminary matter, Martinez must demonstrate that there was a breach of the CBA which Local 100 failed to remedy.[17] Here, no breach has been demonstrated, and the LMRA claim against Local 100 must be dismissed.

█ Even if Martinez had successfully demonstrated that the Corporate Defendants breached the CBA, his claim against Local 100 would fail. To prevail on his claim of breach of the duty of fair representation, Martinez must show that Local 100's actions were "arbitrary, discriminatory or in bad faith."[18] Mere negligence or tactical error on the part of the union are insufficient to establish a breach of the duty of fair representation.[19] As long as the union acts in good faith, the "courts cannot intercede on behalf of employees who may be prejudiced by rationally founded decisions which operate to their particular disadvantage."[20] Furthermore, while a union may not arbitrarily ignore a meritorious grievance, an employee does not have an absolute right to have a grievance arbitrated.[21]

█ Martinez alleges that Local 100's conduct consisted of intentional omissions amounting to bad faith.[22] In support of this allegation, Martinez refers to Local 100's rejection of the memorandum of agreement entered into by Local 100 and DeStefano and claims that Local 100 never properly informed the membership of Greene's intent to close his business. Both claims fail to establish bad faith on the part of Local 100.

The membership's rejection of the memorandum of agreement does not amount to a showing of bad faith by Local 100. Jennings stated that he was not enthusiastic about the terms of the memorandum but that he did not believe he could obtain more favorable terms from Greene. Even assuming that Jennings did do a "bad job" of negotiating, as alleged by Martinez, this alone does not rise to the level of bad faith. Martinez's allegation that Local 100's failure to inform Martinez of Greene's intent to go out of business is contradicted by both Martinez's testimony and his opposition papers. Martinez repeatedly ac-

**17.** *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 570, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976) ("To prevail against either the company or the union, petitioners must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the union.").

**18.** *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 67, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991).

**19.** *Barr v. United Parcel Service*, 868 F.2d 36, 43 (2d Cir.1989).

**20.** *Id.*

**21.** *Vaca v. Sipes*, 386 U.S. 171, 191, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

**22.** *See also NLRB v. Local 282 Int'l Brotherhood of Teamsters*, 740 F.2d 141, 147 (2d Cir.1984) ("an intentional omission, which while not calculated to harm union members, may be so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary").

knowledged that he was told by Jennings that there was a distinct possibility that Greene would close Transportation. Martinez and the union membership simply chose not to believe these warnings. Additionally, in his opposition papers, Martinez admits that Jennings could not have known definitely that Greene was going out of business. Assuming this is true, then Jennings and the union leadership could not have done more than warn the membership of the possibility of a closing. Indeed, in the absence of actual knowledge, Jennings would have been remiss had he overplayed the likelihood of a closing. The inability to provide a definitive prediction of future events does not demonstrate bad faith. At best, Martinez's allegations amount to negligence. Simply put, Martinez has not alleged facts sufficient to demonstrate that Local 100 operated in bad faith.

Martinez also seeks damages for failure to provide notice pursuant to WARN. WARN requires advance notice of a plant closing or mass layoff that results in an "employment loss" to at least fifty people. An employment loss is statutorily defined to include: (a) an employment termination other than a discharge for cause, voluntarily departure, or retirement; (b) a layoff exceeding six (6) months; or (c) a reduction in hours of work of more than fifty percent during each month of any six month period.[23]

■ The Corporate Defendants challenge Martinez's claim on the ground that he has not suffered an employment loss within the definition of WARN. In support of this defense, the Corporate Defendants cite *Martin v. AMR Services Corp.*, 877 F.Supp. 108 (E.D.N.Y.1995), *aff'd sub nom.* 68 F.3d 1529 (2d Cir.1995), where the court employed a "practical effects driven analysis of whether a break in employment occurred." Using this analysis, the court in *Martin* concluded that, while a technical termination of a seller's employees may be deemed to have occurred when a sale becomes effective, WARN notice is required only where the employees, in fact, experience a covered employment loss.[24] As the legislative purpose underlying WARN is to ensure adequate time for employees to adjust to their prospective loss of employment, where employees are transferred almost instantly to other positions, the need to ensure adequate time for retraining or reemployment does not exist and, therefore, WARN is not violated.[25]

Martinez admits in his deposition that nearly all the employees laid off from Transportation were immediately given new jobs at the same or higher wages without having to submit applications.[26] In *Martin,* the court found that, because the employment of the plaintiffs was essentially continuous, no disruption sufficient to constitute an "employment loss" occurred. Martinez attempts to distinguish *Martin* by claiming that, unlike the plaintiffs in *Martin,* he lost both seniority and benefits when he was forced to change employers. Although the court in *Martin* did acknowledge the significance of seniority and benefit retention, Martinez's industry seniority was guaranteed by the Mollen Agreement. Furthermore, Martinez fails to explain what benefits he actually

---

**23.** 29 U.S.C. § 2101(a)(6).

**24.** *Martin v. AMR Services Corp.*, 877 F.Supp. 108 (E.D.N.Y.1995), *aff'd sub nom.* 68 F.3d 1529 (2d Cir.1995).

**25.** *Id.* at 113.

**26.** The seven employees who did not immediately get a new job failed to do so because of either retirement or because they failure to attend the job pick.

lost.[27]

Martinez also relies on *Local 819, IBT v. Textile Deliveries, Inc.*, 2000 WL 1357494 (S.D.N.Y.2000), as being dispositive. In *Local 819*, the court held that WARN notice was required where employees of a purchased corporation were forced to submit applications to the purchasing corporation that subsequently chose which employees to hire. Here, Martinez had to join a new union and choose a new employer, which Martinez argues created a situation requiring WARN notice under the analysis used in *Local 819*. What Martinez ignores however, is that he and the purported class did not have to apply for a job, nor was there a risk of unemployment. They chose their employers in accordance with union rules and, as Martinez admits, the Mollen Agreement guaranteed that the union members would be employed in order of industry seniority. WARN was not enacted to provide continuous employment with any given employer. As stated above, the purpose of WARN is to allow workers who may be laid-off by their current employer a chance to prepare for that eventuality through retraining or other avenues. Here, Martinez and the purported class did not suffer a break in employment; nor did they have to apply for new jobs. Further, Martinez fails to demonstrate that he has lost seniority status or benefits to which he was entitled. Accordingly, WARN notice was not necessary. As Martinez has not alleged facts that demonstrate that WARN notice was necessary, Martinez's WARN claim will be dismissed.

As Martinez's claims have been dismissed on other grounds, the court need not consider whether his LMRA claims are barred for failure to exhaust, or if Transit is a proper defendant in this action.

**Conclusion**

Defendants' motions for summary judgment are granted. Both Martinez and the Corporate Defendants requested an award of attorneys' fees. Such an award is within the Court's discretion and is denied. The Clerk of the Court is directed to enter judgment for the Defendants.

**SO ORDERED.**

---

**27.** Martinez acknowledged that Local 1181 immediately provided health benefits to the transferred employees.